(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WALKER, CHAIRMAN, TEXAS DEPARTMENT OF MOTOR VEHICLES BOARD, ET AL. *v.* TEXAS DIVISION, SONS OF CONFEDERATE VETERANS, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 14–144.   Argued March 23, 2015—Decided June 18, 2015

Texas offers automobile owners a choice between general-issue and specialty license plates.  Those who want the State to issue a particular specialty plate may propose a plate design, comprising a slogan, a graphic, or both.  If the Texas Department of Motor Vehicles Board approves the design, the State will make it available for display on vehicles registered in Texas.  Here, the Texas Division of the Sons of Confederate Veterans and its officers (collectively SCV) filed suit against the Chairman and members of the Board (collectively Board), arguing that the Board's rejection of SCV's proposal for a specialty plate design featuring a Confederate battle flag violated the Free Speech Clause.  The District Court entered judgment for the Board, but the Fifth Circuit reversed, holding that Texas's specialty license plate designs are private speech and that the Board engaged in constitutionally forbidden viewpoint discrimination when it refused to approve SCV's design.

*Held*: Texas's specialty license plate designs constitute government speech, and thus Texas was entitled to refuse to issue plates featuring SCV's proposed design. Pp. 5–18.

   (a) When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says. *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467–468.  A government is generally entitled to promote a program, espouse a policy, or take a position. Were the Free Speech Clause interpreted otherwise, "it is not easy to imagine how government would function." *Id.,* at 468.  That is not to

2          WALKER *v.* TEXAS DIV., SONS OF
                  CONFEDERATE VETERANS, INC.

                           Syllabus

say that a government's ability to express itself is without restriction.
Constitutional and statutory provisions outside of the Free Speech
Clause may limit government speech, and the Free Speech Clause it-
self may constrain the government's speech if, for example, the gov-
ernment seeks to compel private persons to convey the government's
speech.  Pp. 5–6.

  (b) This Court's precedents regarding government speech provide
the appropriate framework through which to approach the case.
Pp. 6–17.

    (1) The same analysis the Court used in *Summum*—to conclude
that a city "accepting a privately donated monument and placing it
on city property" was engaging in government speech, 555 U. S., at
464—leads to the conclusion that government speech is at issue here.
First, history shows that States, including Texas, have long used li-
cense plates to convey government speech, *e.g.,* slogans urging action,
promoting tourism, and touting local industries.  Cf. *id.,* at 470.  Se-
cond, Texas license plate designs "are often closely identified in the
public mind with the [State]."  *Id.,* at 472.  Each plate is a govern-
ment article serving the governmental purposes of vehicle registra-
tion and identification.  The governmental nature of the plates is
clear from their faces: the State places the name "TEXAS" in large
letters across the top of every plate.  Texas also requires Texas vehi-
cle owners to display license plates, issues every Texas plate, and
owns all of the designs on its plates.  The plates are, essentially, gov-
ernment IDs, and ID issuers "typically do not permit" their IDs to
contain "message[s] with which they do not wish to be associated,"
*id.,* at 471.  Third, Texas maintains direct control over the messages
conveyed on its specialty plates, by giving the Board final approval
over each design.  Like the city government in *Summum*, Texas "has
effectively controlled the messages [conveyed] by exercising final ap-
proval authority over their selection."  *Id.,* at 473.  These considera-
tions, taken together, show that Texas's specialty plates are similar
enough to the monuments in *Summum* to call for the same result.
Pp. 7–12.

    (2) Forum analysis, which applies to government restrictions on
purely private speech occurring on government property, *Cornelius* v.
*NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 800, is not
appropriate when the State is speaking on its own behalf.  The par-
ties agree that Texas's specialty license plates are not a traditional
public forum.  Further, Texas's policies and the nature of its license
plates indicate that the State did not intend its specialty plates to
serve as either a designated public forum—where "government prop-
erty . . . not traditionally . . . a public forum is intentionally opened

up for that purpose," *Summum*, *supra*, at 469—or a limited public forum—where a government "reserv[es a forum] for certain groups or for the discussion of certain topics," *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829. The State exercises final authority over the messages that may be conveyed by its specialty plates, it takes ownership of each specialty plate design, and it has traditionally used its plates for government speech. These features of Texas specialty plates militate against a determination that Texas has created a public forum. Finally, the plates are not a nonpublic forum, where the "government is . . . a proprietor, managing its internal operations." *International Soc. for Krishna Consciousness, Inc.* v. *Lee*, 505 U. S. 672, 678–679. The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum provider. See *Summum*, *supra,* at 470–471. Nor does Texas's requirement that vehicle owners pay annual fees for specialty plates mean that the plates are a forum for private speech. And this case does not resemble other nonpublic forum cases. *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 48–49; *Lehman* v. *Shaker Heights,* 418 U. S. 298; and *Cornelius*, *supra,* at 804–806, distinguished. Pp. 13–17.

  (c) The determination that Texas's specialty license plate designs are government speech does not mean that the designs do not also implicate the free speech rights of private persons. The Court has acknowledged that drivers who display a State's selected license plate designs convey the messages communicated through those designs. See *Wooley* v. *Maynard*, 430 U. S. 705, 717, n. 15. The Court has also recognized that the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees. Just as Texas cannot require SCV to convey "the State's ideological message," *id.*, at 715, SCV cannot force Texas to include a Confederate battle flag on its specialty license plates. Pp. 17–18.

759 F. 3d 388, reversed.

BREYER, J., delivered the opinion of the Court, in which THOMAS, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA and KENNEDY, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–144

JOHN WALKER, III, CHAIRMAN, TEXAS DEPARTMENT OF MOTOR VEHICLES BOARD, ET AL., PETITIONERS *v.* TEXAS DIVISION, SONS OF CONFEDERATE VETERANS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2015]

JUSTICE BREYER delivered the opinion of the Court.

Texas offers automobile owners a choice between ordinary and specialty license plates. Those who want the State to issue a particular specialty plate may propose a plate design, comprising a slogan, a graphic, or (most commonly) both. If the Texas Department of Motor Vehicles Board approves the design, the State will make it available for display on vehicles registered in Texas.

In this case, the Texas Division of the Sons of Confederate Veterans proposed a specialty license plate design featuring a Confederate battle flag. The Board rejected the proposal. We must decide whether that rejection violated the Constitution's free speech guarantees. See Amdts. 1, 14. We conclude that it did not.

I

A

Texas law requires all motor vehicles operating on the State's roads to display valid license plates. See Tex. Transp. Code Ann. §§502.001 (West Supp. 2014), 504.001

(2013), 504.943 (Supp. 2014).  And Texas makes available
several kinds of plates.  Drivers may choose to display the
State's general-issue license plates.  See Texas Dept. of
Motor Vehicles, Motor Vehicle Registration Manual 9.1
(Apr. 2015).    Each of these plates contains the word
"Texas," a license plate number, a silhouette of the
State, a graphic of the Lone Star, and the slogan
"The Lone Star State."  Texas Dept. of Motor Vehicles, The
Texas   Classic   FAQs   (July   16,   2012),   online   at
http://www.txdmv.gov/motorists/license-plates  (all  Inter-
net materials as visited June 16, 2015, and available in
Clerk of Court's case file).  In the alternative, drivers may
choose from an assortment of specialty license plates.
§504.008(b) (West 2013).  Each of these plates contains the
word "Texas," a license plate number, and one of a selec-
tion of designs prepared by the State.  See *ibid.*; Specialty
License   Plates,   http://www.txdmv.gov/motorists/license-
plates/specialty-license-plates (displaying available Texas
specialty   plates);   Create   a   Plate:   Your   Design,
http://www.myplates.com/BackgroundOnly (same).  Finally,
Texas law provides for personalized plates (also known
as vanity plates).   43 Tex. Admin. Code §217.45(c)(7)
(2015).  Pursuant to the personalization program, a vehi-
cle owner may request a particular alphanumeric pattern
for use as a plate number, such as "BOB" or "TEXPL8."

   Here we are concerned only with the second category of
plates, namely specialty license plates, not with the per-
sonalization program.  Texas offers vehicle owners a va-
riety of specialty plates, generally for an annual fee.  See
§217.45(b)(2).  And Texas selects the designs for specialty
plates through three distinct processes.

   First, the state legislature may specifically call for the
development of a specialty license plate.  See Tex. Transp.
Code §§504.602–504.663 (West 2013 and Supp. 2014).  The
legislature has enacted statutes authorizing, for example,
plates that say "Keep Texas Beautiful" and "Mothers

Against Drunk Driving," plates that "honor" the Texas citrus industry, and plates that feature an image of the World Trade Center towers and the words "Fight Terrorism." See §§504.602, 504.608, 504.626, 504.647.

Second, the Board may approve a specialty plate design proposal that a state-designated private vendor has created at the request of an individual or organization. See §§504.6011(a), 504.851(a); 43 Tex. Admin. Code §217.52(b). Among the plates created through the private-vendor process are plates promoting the "Keller Indians" and plates with the slogan "Get it Sold with RE/MAX."

Third, the Board "may create new specialty license plates on its own initiative or on receipt of an application from a" nonprofit entity seeking to sponsor a specialty plate. Tex. Transp. Code Ann. §§504.801(a), (b). A nonprofit must include in its application "a draft design of the specialty license plate." 43 Tex. Admin. Code §217.45(i)(2)(C). And Texas law vests in the Board authority to approve or to disapprove an application. See §217.45(i)(7). The relevant statute says that the Board "may refuse to create a new specialty license plate" for a number of reasons, for example "if the design might be offensive to any member of the public . . . or for any other reason established by rule." Tex. Transp. Code Ann. §504.801(c). Specialty plates that the Board has sanctioned through this process include plates featuring the words "The Gator Nation," together with the Florida Gators logo, and plates featuring the logo of Rotary International and the words "SERVICE ABOVE SELF."

B

In 2009, the Sons of Confederate Veterans, Texas Division (a nonprofit entity), applied to sponsor a specialty license plate through this last-mentioned process. SCV's application included a draft plate design. See Appendix, *infra*. At the bottom of the proposed plate were the words

"SONS OF CONFEDERATE VETERANS." At the side was the organization's logo, a square Confederate battle flag framed by the words "Sons of Confederate Veterans 1896." A faint Confederate battle flag appeared in the background on the lower portion of the plate. Additionally, in the middle of the plate was the license plate number, and at the top was the State's name and silhouette. The Board's predecessor denied this application.

In 2010, SCV renewed its application before the Board. The Board invited public comment on its website and at an open meeting. After considering the responses, including a number of letters sent by elected officials who opposed the proposal, the Board voted unanimously against issuing the plate. The Board explained that it had found "it necessary to deny th[e] plate design application, specifically the confederate flag portion of the design, because public comments ha[d] shown that many members of the general public find the design offensive, and because such comments are reasonable." App. 64. The Board added "that a significant portion of the public associate the confederate flag with organizations advocating expressions of hate directed toward people or groups that is demeaning to those people or groups." *Id.,* at 65.

In 2012, SCV and two of its officers (collectively SCV) brought this lawsuit against the chairman and members of the Board (collectively Board). SCV argued that the Board's decision violated the Free Speech Clause of the First Amendment, and it sought an injunction requiring the Board to approve the proposed plate design. The District Court entered judgment for the Board. A divided panel of the Court of Appeals for the Fifth Circuit reversed. *Texas Div., Sons of Confederate Veterans, Inc.,* v. *Vandergriff*, 759 F. 3d 388 (2014). It held that Texas's specialty license plate designs are private speech and that the Board, in refusing to approve SCV's design, engaged in constitutionally forbidden viewpoint discrimination. The

dissenting judge argued that Texas's specialty license plate designs are government speech, the content of which the State is free to control.

We granted the Board's petition for certiorari, and we now reverse.

## II

When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says. *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467–468 (2009). That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech. See *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 235 (2000). Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas. See *Johanns* v. *Livestock Marketing Assn.*, 544 U. S. 550, 559 (2005). Instead, the Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government that, through words and deeds, will reflect its electoral mandate. See *Stromberg* v. *California*, 283 U. S. 359, 369 (1931) (observing that "our constitutional system" seeks to maintain "the opportunity for free political discussion to the end that government may be responsive to the will of the people").

Were the Free Speech Clause interpreted otherwise, government would not work. How could a city government create a successful recycling program if officials, when writing householders asking them to recycle cans and bottles, had to include in the letter a long plea from the local trash disposal enterprise demanding the contrary? How could a state government effectively develop programs designed to encourage and provide vaccinations, if

officials also had to voice the perspective of those who
oppose this type of immunization?   "[I]t is not easy to
imagine how government could function if it lacked th[e]
freedom" to select the messages it wishes to convey.
*Summum*, *supra,* at 468.

We have therefore refused "[t]o hold that the Govern-
ment unconstitutionally discriminates on the basis of
viewpoint when it chooses to fund a program dedicated to
advance certain permissible goals, because the program in
advancing those goals necessarily discourages alternative
goals." *Rust* v. *Sullivan*, 500 U. S. 173, 194 (1991).  We
have pointed out that a contrary holding "would render
numerous Government programs constitutionally sus-
pect." *Ibid.*  Cf. *Keller* v. *State Bar of Cal.*, 496 U. S. 1, 12–
13 (1990) ("If every citizen were to have a right to insist
that no one paid by public funds express a view with
which he disagreed, debate over issues of great concern to
the public would be limited to those in the private sector,
and the process of government as we know it radically
transformed").  And we have made clear that "the govern-
ment can speak for itself." *Southworth*, *supra,* at 229.

That is not to say that a government's ability to express
itself is without restriction.  Constitutional and statutory
provisions outside of the Free Speech Clause may limit
government speech.  *Summum*, *supra,* at 468.  And the
Free Speech Clause itself may constrain the government's
speech if, for example, the government seeks to compel
private persons to convey the government's speech.  But,
as a general matter, when the government speaks it is
entitled to promote a program, to espouse a policy, or to
take a position.  In doing so, it represents its citizens and
it carries out its duties on their behalf.

### III

In our view, specialty license plates issued pursuant to
Texas's statutory scheme convey government speech.  Our

reasoning rests primarily on our analysis in *Summum*, a recent case that presented a similar problem. We conclude here, as we did there, that our precedents regarding government speech (and not our precedents regarding forums for private speech) provide the appropriate framework through which to approach the case. See 555 U. S., at 464.

### A

In *Summum*, we considered a religious organization's request to erect in a 2.5-acre city park a monument setting forth the organization's religious tenets. See *id.,* at 464–465. In the park were 15 other permanent displays. *Id.,* at 464. At least 11 of these—including a wishing well, a September 11 monument, a historic granary, the city's first fire station, and a Ten Commandments monument—had been donated to the city by private entities. *Id.,* at 464–465. The religious organization argued that the Free Speech Clause required the city to display the organization's proposed monument because, by accepting a broad range of permanent exhibitions at the park, the city had created a forum for private speech in the form of monuments. Brief for Respondent in *Pleasant Grove City* v. *Summum*, O. T. 2008, No. 07–665, pp. 2–3, 30–36.

This Court rejected the organization's argument. We held that the city had not "provid[ed] a forum for private speech" with respect to monuments. *Summum*, 555 U. S., at 470. Rather, the city, even when "accepting a privately donated monument and placing it on city property," had "engage[d] in expressive conduct." *Id.,* at 476. The speech at issue, this Court decided, was "best viewed as a form of government speech" and "therefore [was] not subject to scrutiny under the Free Speech Clause." *Id.,* at 464.

We based our conclusion on several factors. First, history shows that "[g]overnments have long used monuments to speak to the public." *Id.,* at 470. Thus, we observed

that "[w]hen a government entity arranges for the construction of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure." *Ibid.*

Second, we noted that it "is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." *Id.,* at 471. As a result, "persons who observe donated monuments routinely—and reasonably—interpret them as conveying some message on the property owner's behalf." *Ibid.* And "observers" of such monuments, as a consequence, ordinarily "appreciate the identity of the speaker." *Ibid.*

Third, we found relevant the fact that the city maintained control over the selection of monuments. We thought it "fair to say that throughout our Nation's history, the general government practice with respect to donated monuments has been one of selective receptivity." *Ibid.* And we observed that the city government in *Summum* "'effectively controlled' the messages sent by the monuments in the [p]ark by exercising 'final approval authority' over their selection." *Id.,* at 473.

In light of these and a few other relevant considerations, the Court concluded that the expression at issue was government speech. See *id.,* at 470–472. And, in reaching that conclusion, the Court rejected the premise that the involvement of private parties in designing the monuments was sufficient to prevent the government from controlling which monuments it placed in its own public park. See *id.,* at 470–471. Cf. *Rust, supra*, at 192–196 (upholding a federal regulation limiting speech in a Government-funded program where the program was established and administered by private parties).

## B

Our analysis in *Summum* leads us to the conclusion

that here, too, government speech is at issue. First, the history of license plates shows that, insofar as license plates have conveyed more than state names and vehicle identification numbers, they long have communicated messages from the States. Cf. 555 U. S., at 470 ("Governments have long used monuments to speak to the public"). In 1917, Arizona became the first State to display a graphic on its plates. J. Fox, License Plates of the United States 15 (1997) (Fox); J. Minard & T. Stentiford, A Moving History 56 (2004) (Minard). The State presented a depiction of the head of a Hereford steer. Fox 15; Minard 56. In the years since, New Hampshire plates have featured the profile of the "Old Man of the Mountain," Massachusetts plates have included a representation of the Commonwealth's famous codfish, and Wyoming plates have displayed a rider atop a bucking bronco. Minard 60, 61, 66.

In 1928, Idaho became the first State to include a slogan on its plates. The 1928 Idaho plate proclaimed "Idaho Potatoes" and featured an illustration of a brown potato, onto which the license plate number was superimposed in green. *Id.,* at 61. The brown potato did not catch on, but slogans on license plates did. Over the years, state plates have included the phrases "North to the Future" (Alaska), "Keep Florida Green" (Florida), "Hoosier Hospitality" (Indiana), "The Iodine Products State" (South Carolina), "Green Mountains" (Vermont), and "America's Dairyland" (Wisconsin). Fox 13, 29, 39, 91, 101, 109. States have used license plate slogans to urge action, to promote tourism, and to tout local industries.

Texas, too, has selected various messages to communicate through its license plate designs. By 1919, Texas had begun to display the Lone Star emblem on its plates. Texas Department of Transportation, The History of Texas License Plates 9, 11 (1999). In 1936, the State's general-issue plates featured the first slogan on Texas

license plates: the word "Centennial." *Id.,* at 20. In 1968, Texas plates promoted a San Antonio event by including the phrase "Hemisfair 68." *Id.,* at 46. In 1977, Texas replaced the Lone Star with a small silhouette of the State. *Id.,* at 63. And in 1995, Texas plates celebrated "150 Years of Statehood." *Id.,* at 101. Additionally, the Texas Legislature has specifically authorized specialty plate designs stating, among other things, "Read to Succeed," "Houston Livestock Show and Rodeo," "Texans Conquer Cancer," and "Girl Scouts." Tex. Transp. Code Ann. §§504.607, 504.613, 504.620, 504.622. This kind of state speech has appeared on Texas plates for decades.

Second, Texas license plate designs "are often closely identified in the public mind with the [State]." *Summum*, *supra*, at 472. Each Texas license plate is a government article serving the governmental purposes of vehicle registration and identification. The governmental nature of the plates is clear from their faces: The State places the name "TEXAS" in large letters at the top of every plate. Moreover, the State requires Texas vehicle owners to display license plates, and every Texas license plate is issued by the State. See §504.943. Texas also owns the designs on its license plates, including the designs that Texas adopts on the basis of proposals made by private individuals and organizations. See §504.002(3). And Texas dictates the manner in which drivers may dispose of unused plates. See §504.901(c). See also §504.008(g) (requiring that vehicle owners return unused specialty plates to the State).

Texas license plates are, essentially, government IDs. And issuers of ID "typically do not permit" the placement on their IDs of "message[s] with which they do not wish to be associated." *Summum,* 555 U. S., at 471. Consequently, "persons who observe" designs on IDs "routinely—and reasonably—interpret them as conveying some message on the [issuer's] behalf." *Ibid.*

Indeed, a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message. If not, the individual could simply display the message in question in larger letters on a bumper sticker right next to the plate. But the individual prefers a license plate design to the purely private speech expressed through bumper stickers. That may well be because Texas's license plate designs convey government agreement with the message displayed.

Third, Texas maintains direct control over the messages conveyed on its specialty plates. Texas law provides that the State "has sole control over the design, typeface, color, and alphanumeric pattern for all license plates." §504.005. The Board must approve every specialty plate design proposal before the design can appear on a Texas plate. 43 Tex. Admin. Code §§217.45(i)(7)–(8), 217.52(b). And the Board and its predecessor have actively exercised this authority. Texas asserts, and SCV concedes, that the State has rejected at least a dozen proposed designs. Reply Brief 10; Tr. of Oral Arg. 49–51. Accordingly, like the city government in *Summum*, Texas "has 'effectively controlled' the messages [conveyed] by exercising 'final approval authority' over their selection." 555 U. S., at 473 (quoting *Johanns*, 544 U. S., at 560–561).

This final approval authority allows Texas to choose how to present itself and its constituency. Thus, Texas offers plates celebrating the many educational institutions attended by its citizens. See Tex. Transp. Code Ann. §504.615. But it need not issue plates deriding schooling. Texas offers plates that pay tribute to the Texas citrus industry. See §504.626. But it need not issue plates praising Florida's oranges as far better. And Texas offers plates that say "Fight Terrorism." See §504.647. But it need not issue plates promoting al Qaeda.

These considerations, taken together, convince us that the specialty plates here in question are similar enough to

the monuments in *Summum* to call for the same result. That is not to say that every element of our discussion in *Summum* is relevant here. For instance, in *Summum* we emphasized that monuments were "permanent" and we observed that "public parks can accommodate only a limited number of permanent monuments." 555 U. S., at 464, 470, 478. We believed that the speech at issue was government speech rather than private speech in part because we found it "hard to imagine how a public park could be opened up for the installation of permanent monuments by every person or group wishing to engage in that form of expression." *Id.,* at 479. Here, a State could theoretically offer a much larger number of license plate designs, and those designs need not be available for time immemorial.

But those characteristics of the speech at issue in *Summum* were particularly important because the government speech at issue occurred in public parks, which are traditional public forums for "the delivery of speeches and the holding of marches and demonstrations" by private citizens. *Id.,* at 478. By contrast, license plates are not traditional public forums for private speech.

And other features of the designs on Texas's specialty license plates indicate that the message conveyed by those designs is conveyed on behalf of the government. Texas, through its Board, selects each design featured on the State's specialty license plates. Texas presents these designs on government-mandated, government-controlled, and government-issued IDs that have traditionally been used as a medium for government speech. And it places the designs directly below the large letters identifying "TEXAS" as the issuer of the IDs. "The [designs] that are accepted, therefore, are meant to convey and have the effect of conveying a government message, and they thus constitute government speech." *Id.,* at 472.

## C

SCV believes that Texas's specialty license plate designs are not government speech, at least with respect to the designs (comprising slogans and graphics) that were initially proposed by private parties. According to SCV, the State does not engage in expressive activity through such slogans and graphics, but rather provides a forum for private speech by making license plates available to display the private parties' designs. We cannot agree.

We have previously used what we have called "forum analysis" to evaluate government restrictions on purely private speech that occurs on government property. *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 800 (1985). But forum analysis is misplaced here. Because the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply.

The parties agree that Texas's specialty license plates are not a "traditional public forum," such as a street or a park, "which ha[s] immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45–46 (1983) (internal quotation marks omitted). "The Court has rejected the view that traditional public forum status extends beyond its historic confines." *Arkansas Ed. Television Comm'n* v. *Forbes*, 523 U. S. 666, 678 (1998). And state-issued specialty license plates lie far beyond those confines.

It is equally clear that Texas's specialty plates are neither a "'designated public forum,'" which exists where "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose," *Summum, supra,* at 469, nor a "limited public forum," which exists where a government has

"reserv[ed a forum] for certain groups or for the discussion
of certain topics," *Rosenberger* v. *Rector and Visitors of
Univ. of Va.*, 515 U. S. 819, 829 (1995). A government
"does not create a public forum by inaction or by permit-
ting limited discourse, but only by intentionally opening a
nontraditional forum for public discourse." *Cornelius*, 473
U. S., at 802. And in order "to ascertain whether [a gov-
ernment] intended to designate a place not traditionally
open to assembly and debate as a public forum," this Court
"has looked to the policy and practice of the government"
and to "the nature of the property and its compatibility
with expressive activity." *Ibid.*

Texas's policies and the nature of its license plates
indicate that the State did not intend its specialty license
plates to serve as either a designated public forum or a
limited public forum. First, the State exercises final au-
thority over each specialty license plate design. This
authority militates against a determination that Texas
has created a public forum. See *id.,* at 803–804 (explain-
ing that a school mail system was not a public forum
because "[t]he practice was to require permission from the
individual school principal before access to the system to
communicate with teachers was granted"). Second, Texas
takes ownership of each specialty plate design, making it
particularly untenable that the State intended specialty
plates to serve as a forum for public discourse. Finally,
Texas license plates have traditionally been used for
government speech, are primarily used as a form of gov-
ernment ID, and bear the State's name. These features of
Texas license plates indicate that Texas explicitly associ-
ates itself with the speech on its plates.

For similar reasons, we conclude that Texas's specialty
license plates are not a "nonpublic for[um]," which exists
"[w]here the government is acting as a proprietor, manag-
ing its internal operations." *International Soc. for Krishna
Consciousness, Inc.* v. *Lee*, 505 U. S. 672, 678–679 (1992).

With respect to specialty license plate designs, Texas is not simply managing government property, but instead is engaging in expressive conduct. As we have described, we reach this conclusion based on the historical context, observers' reasonable interpretation of the messages conveyed by Texas specialty plates, and the effective control that the State exerts over the design selection process. Texas's specialty license plate designs "are meant to convey and have the effect of conveying a government message." *Summmum*, 555 U. S., at 472. They "constitute government speech." *Ibid.*

The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider. In *Summmum*, private entities "financed and donated monuments that the government accept[ed] and display[ed] to the public." *Id.,* at 470–471. Here, similarly, private parties propose designs that Texas may accept and display on its license plates. In this case, as in *Summmum*, the "government entity may exercise [its] freedom to express its views" even "when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Id.,* at 468. And in this case, as in *Summmum*, forum analysis is inapposite. See *id.,* at 480.

Of course, Texas allows many more license plate designs than the city in *Summmum* allowed monuments. But our holding in *Summmum* was not dependent on the precise number of monuments found within the park. Indeed, we indicated that the permanent displays in New York City's Central Park also constitute government speech. See *id.,* at 471–472. And an *amicus* brief had informed us that there were, at the time, 52 such displays. See Brief for City of New York in *Pleasant Grove City* v. *Summmum*, O. T. 2008, No. 07–665, p. 2. Further, there may well be many more messages that Texas wishes to convey through

its license plates than there were messages that the city in
*Summum* wished to convey through its monuments.
Texas's desire to communicate numerous messages does
not mean that the messages conveyed are not Texas's own.

Additionally, the fact that Texas vehicle owners pay
annual fees in order to display specialty license plates
does not imply that the plate designs are merely a forum
for private speech. While some nonpublic forums provide
governments the opportunity to profit from speech, see,
*e.g., Lehman* v. *Shaker Heights*, 418 U. S. 298, 299 (1974)
(plurality opinion), the existence of government profit
alone is insufficient to trigger forum analysis. Thus, if the
city in *Summum* had established a rule that organizations
wishing to donate monuments must also pay fees to assist
in park maintenance, we do not believe that the result in
that case would have been any different. Here, too, we
think it sufficiently clear that Texas is speaking through
its specialty license plate designs, such that the existence
of annual fees does not convince us that the specialty
plates are a nonpublic forum.

Finally, we note that this case does not resemble other
cases in which we have identified a nonpublic forum. This
case is not like *Perry Ed. Assn.*, where we found a school
district's internal mail system to be a nonpublic forum for
private speech. See 460 U. S., at 48–49. There, it was
undisputed that a number of private organizations, includ-
ing a teachers' union, had access to the mail system. See
*id.,* at 39–40. It was therefore clear that private parties,
and not only the government, used the system to com-
municate. Here, by contrast, each specialty license plate
design is formally approved by and stamped with the
imprimatur of Texas.

Nor is this case like *Lehman*, where we found the adver-
tising space on city buses to be a nonpublic forum. See
*R. A. V.* v. *St. Paul*, 505 U. S. 377, 390, n. 6 (1992) (identi-
fying *Lehman* as a case about a nonpublic forum). There,

the messages were located in a context (advertising space) that is traditionally available for private speech. And the advertising space, in contrast to license plates, bore no indicia that the speech was owned or conveyed by the government.

Nor is this case like *Cornelius*, where we determined that a charitable fundraising program directed at federal employees constituted a nonpublic forum. See 473 U. S., at 804–806. That forum lacked the kind of history present here. The fundraising drive had never been a medium for government speech. Instead, it was established "to bring order to [a] solicitation process" which had previously consisted of ad hoc solicitation by individual charitable organizations. *Id.,* at 792, 805. The drive "was designed to minimize . . . disruption to the [federal] workplace," *id.,* at 805, not to communicate messages from the government. Further, the charitable solicitations did not appear on a government ID under the government's name. In contrast to the instant case, there was no reason for employees to "interpret [the solicitation] as conveying some message on the [government's] behalf." *Summum*, 555 U. S., at 471.

## IV

Our determination that Texas's specialty license plate designs are government speech does not mean that the designs do not also implicate the free speech rights of private persons. We have acknowledged that drivers who display a State's selected license plate designs convey the messages communicated through those designs. See *Wooley* v. *Maynard*, 430 U. S. 705, 717, n. 15, 715 (1977) (observing that a vehicle "is readily associated with its operator" and that drivers displaying license plates "use their private property as a 'mobile billboard' for the State's ideological message"). And we have recognized that the First Amendment stringently limits a State's authority to

compel a private party to express a view with which the private party disagrees.  See *id.,* at 715; *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U. S. 557, 573 (1995); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943).  But here, compelled private speech is not at issue.  And just as Texas cannot require SCV to convey "the State's ideological message," *Wooley*, *supra*, at 715, SCV cannot force Texas to include a Confederate battle flag on its specialty license plates.

\*      \*      \*

For the reasons stated, we hold that Texas's specialty license plate designs constitute government speech and that Texas was consequently entitled to refuse to issue plates featuring SCV's proposed design.  Accordingly, the judgment of the United States Court of Appeals for the Fifth Circuit is

*Reversed.*

APPENDIX



Proposed License Plate Design.   App. to Pet. for Cert. 191a.

# SUPREME COURT OF THE UNITED STATES

———————

No. 14–144

———————

## JOHN WALKER, III, CHAIRMAN, TEXAS DEPARTMENT OF MOTOR VEHICLES BOARD, ET AL., PETITIONERS *v.* TEXAS DIVISION, SONS OF CONFEDERATE VETERANS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2015]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join, dissenting.

The Court's decision passes off private speech as government speech and, in doing so, establishes a precedent that threatens private speech that government finds displeasing. Under our First Amendment cases, the distinction between government speech and private speech is critical. The First Amendment "does not regulate government speech," and therefore when government speaks, it is free "to select the views that it wants to express." *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467–468 (2009). By contrast, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828 (1995).

Unfortunately, the Court's decision categorizes private speech as government speech and thus strips it of all First Amendment protection. The Court holds that all the privately created messages on the many specialty plates issued by the State of Texas convey a government message rather than the message of the motorist displaying the plate. Can this possibly be correct?

Here is a test. Suppose you sat by the side of a Texas

highway and studied the license plates on the vehicles
passing by.  You would see, in addition to the standard
Texas plates, an impressive array of specialty plates.
(There are now more than 350 varieties.)  You would likely
observe plates that honor numerous colleges and universi-
ties.  You might see plates bearing the name of a high
school, a fraternity or sorority, the Masons, the Knights of
Columbus, the Daughters of the American Revolution, a
realty company, a favorite soft drink, a favorite burger
restaurant, and a favorite NASCAR driver.

As you sat there watching these plates speed by, would
you really think that the sentiments reflected in these
specialty plates are the views of the State of Texas and not
those of the owners of the cars?  If a car with a plate that
says "Rather Be Golfing" passed by at 8:30 am on a Mon-
day morning, would you think:  "This is the official policy
of the State—better to golf than to work?"  If you did your
viewing at the start of the college football season and you
saw Texas plates with the names of the University of
Texas's out-of-state competitors in upcoming games—
Notre Dame, Oklahoma State, the University of Okla-
homa, Kansas State, Iowa State—would you assume that the
State of Texas was officially (and perhaps treasonously)
rooting for the Longhorns' opponents?  And when a car
zipped by with a plate that reads "NASCAR – 24 Jeff
Gordon," would you think that Gordon (born in California,
raised in Indiana, resides in North Carolina)[1] is the official
favorite of the State government?

The Court says that all of these messages are govern-
ment speech.  It is essential that government be able to
express its own viewpoint, the Court reminds us, because
otherwise, how would it promote its programs, like recy-
cling and vaccinations?  *Ante*, at 5–6.  So when Texas
issues a "Rather Be Golfing" plate, but not a "Rather Be

_____

[1] Elliot, Shifting Gears, Forbes Life, Oct. 2013, pp. 55, 57.

Playing Tennis" or "Rather Be Bowling" plate, it is fur-
thering a state policy to promote golf but not tennis or
bowling. And when Texas allows motorists to obtain a
Notre Dame license plate but not a University of South-
ern California plate, it is taking sides in that long-time
rivalry.

This capacious understanding of government speech
takes a large and painful bite out of the First Amendment.
Specialty plates may seem innocuous. They make motor-
ists happy, and they put money in a State's coffers. But
the precedent this case sets is dangerous. While all li-
cense plates unquestionably contain *some* government
speech (*e.g.,* the name of the State and the numbers and/or
letters identifying the vehicle), the State of Texas has
converted the remaining space on its specialty plates into
little mobile billboards on which motorists can display
their own messages. And what Texas did here was to
reject one of the messages that members of a private
group wanted to post on some of these little billboards be-
cause the State thought that many of its citizens would
find the message offensive. That is blatant viewpoint
discrimination.

If the State can do this with its little mobile billboards,
could it do the same with big, stationary billboards? Sup-
pose that a State erected electronic billboards along its
highways. Suppose that the State posted some govern-
ment messages on these billboards and then, to raise
money, allowed private entities and individuals to pur-
chase the right to post their own messages. And suppose
that the State allowed only those messages that it liked or
found not too controversial. Would that be constitutional?

What if a state college or university did the same thing
with a similar billboard or a campus bulletin board or
dorm list serve? What if it allowed private messages that
are consistent with prevailing views on campus but
banned those that disturbed some students or faculty?

Can there be any doubt that these examples of viewpoint discrimination would violate the First Amendment?    I hope not, but the future uses of today's precedent remain to be seen.

## I
### A

Specialty plates like those involved in this case are a recent development.  License plates originated solely as a means of identifying vehicles.  In 1901, New York became the first State to require automobiles to be licensed, but rather than issue license plates itself, New York required drivers to display their initials on their cars.  J. Minard & T. Stentiford, A Moving History 50 (2004).  Two years later, Massachusetts became the first State to issue license plates.  The plates said "Mass. Automobile Register" and displayed the vehicle's registration number.  *Id.*, at 51.  Plates of this type—featuring a registration number, the name of the State, and sometimes the date—were the standard for decades thereafter.  See *id.*, at 52–94; see also generally, J. Fox, License Plates of the United States 10–99 (1997).

Texas license plates initially followed this pattern.  When the first official state plate appeared in 1917, it featured a number and the abbreviation "TEX."  Texas Department of Transportation, The History of Texas License Plates 9 (1999) (History).  In 1925, the year of issue was added, and the State began issuing plates that identified certain vehicle types, *e.g.*, "C-M" for commercial trucks (1925), *id.*, at 14–15; "FARM" for farm trucks (1935), *id.*, at 22; "Overwidth" (1949), *id.*, at 32; "House Trailer" (1951), *id.*, at 36.  In 1936, a special plate with the word "CENTENNIAL" was created to mark the State's 100th birthday, and the first plate identifying the owner as a "State Official" appeared two years later.  *Id.*, at 20, 25.  Starting in the 1950's, Texas began issuing plates to

identify some other registrants, such as "Amateur Radio Operator" (1954), *id.*, at 38, "State Judge" (1970) *id.*, at 64; and "Disabled Veteran," (1972), *id.*, at 79.

A sesquicentennial plate appeared in 1985, and two years later, legislation was introduced to create a bronze license plate with 14-karat gold-plated lettering, available for a fee of $1,000. *Id.*, at 81. The proposal aimed to make the State a profit, but it failed to pass. *Ibid.*

It was not until 1989 that anything that might be considered a message was featured regularly on Texas plates. The words "The Lone Star State" were added "as a means of bringing favorable recognition to Texas." *Id.*, at 82.

Finally, in the late 1990's, license plates containing a small variety of messages, selected by the State, became available for the first time. *Id.*, at 101. These messages included slogans like "Read to Succeed," "Keep Texas Beautiful," "Animal Friendly," "Big Bend National Park," "Houston Livestock Show and Rodeo," and "Lone Star Proud." *Id.,* at 101, 113. Also issued in the 1990's were plates bearing the names of colleges and universities, and some plates (*e.g.*, "State of the Arts," "State Capitol Restoration") were made available to raise funds for special purposes. *Id.,* 101.

Once the idea of specialty plates took hold, the number of varieties quickly multiplied, and today, we are told, Texas motorists can choose from more than 350 messages, including many designs proposed by nonprofit groups or by individuals and for-profit businesses through the State's third-party vendor. Brief for Respondents at 2; see also Texas Department of Motor Vehicles, online at http:// www.txdmv.gov/motorists/license-plates/specialty-license-plates (all Internet materials as visited June 12, 2015, and available in Clerk of Court's case file); http:// www.myplates.com.

Drivers can select plates advertising organizations and causes like 4–H, the Boy Scouts, the American Legion, Be

a Blood Donor, the Girl Scouts, Insure Texas Kids, Mothers Against Drunk Driving, Marine Mammal Recovery, Save Texas Ocelots, Share the Road, Texas Reads, Texas Realtors ("I am a Texas Realtor"), the Texas State Rifle Association ("WWW.TSRA.COM"), the Texas Trophy Hunters Association, the World Wildlife Fund, the YMCA, and Young Lawyers.[2]

There are plates for fraternities and sororities and for in-state schools, both public (like Texas A & M and Texas Tech) and private (like Trinity University and Baylor). An even larger number of schools from out-of-state are honored: Arizona State, Brigham Young, Florida State, Michigan State, Alabama, and South Carolina, to name only a few.

There are political slogans, like "Come and Take It" and "Don't Tread on Me," and plates promoting the citrus industry and the "Cotton Boll." Commercial businesses can have specialty plates, too. There are plates advertising Remax ("Get It Sold with Remax"), Dr. Pepper ("Always One of a Kind"), and Mighty Fine Burgers.

B

The Texas Division of Sons of Confederate Veterans (SCV) is an organization composed of descendants of Confederate soldiers. The group applied for a Texas specialty license plate in 2009 and again in 2010. Their proposed design featured a controversial symbol, the Confederate battle flag, surrounded by the words "Sons of Confederate Veterans 1896" and a gold border. App. 29. The Texas Department of Motor Vehicles Board (or Board) invited public comments and considered the plate design at a meeting in April 2011. At that meeting, one board member was absent, and the remaining eight members

_____

[2] The Appendix, *infra*, reproduces the available specialty plates mentioned throughout this opinion in order of first reference. When categories are referenced, examples from the category have been included.

deadlocked on whether to approve the plate. The Board thus reconsidered the plate at its meeting in November 2011. This time, many opponents of the plate turned out to voice objections. The Board then voted unanimously against approval and issued an order stating:

> "The Board has considered the information and finds it necessary to deny this plate design application, specifically the confederate flag portion of the design, because public comments have shown that many members of the general public find the design offensive, and because such comments are reasonable. The Board finds that a significant portion of the public associate the confederate flag with organizations advocating expressions of hate directed toward people or groups that is demeaning to those people or groups." *Id.*, at 64–65.

The Board also saw "a compelling public interest in protecting a conspicuous mechanism for identification, such as a license plate, from degrading into a possible public safety issue." *Id.*, at 65. And it thought that the public interest required rejection of the plate design because the controversy surrounding the plate was so great that "the design could distract or disturb some drivers to the point of being unreasonably dangerous." *Ibid.*

At the same meeting, the Board approved a Buffalo Soldiers plate design by a 5-to-3 vote. Proceeds from fees paid by motorists who select that plate benefit the Buffalo Soldier National Museum in Houston, which is "dedicated primarily to preserving the legacy and honor of the African American soldier." Buffalo Soldier National Museum, online at http://www.buffalosoldiermuseum.com. "Buffalo Soldiers" is a nickname that was originally given to black soldiers in the Army's 10th Cavalry Regiment, which was formed after the Civil War, and the name was later used to describe other black soldiers. W. Leckie & S. Leckie,

The Buffalo Soldiers: A Narrative of the Black Cavalry in the West 21, 26–27 (2003).  The original Buffalo Soldiers fought with distinction in the Indian Wars, but the "Buffalo Soldiers" plate was opposed by some Native Americans. One leader commented that he felt "'the same way about the Buffalo Soldiers'" as African-Americans felt about the Confederate flag.  Scharrer, Specialty License Plates can Bring in Revenue, But Some Stir Up Controversy, Houston Chronicle, Nov. 26, 2011, P.B2.  "'When we see the U. S. Cavalry uniform,'" he explained, "'we are forced to relive an American holocaust.'"  *Ibid.*

## II

### A

Relying almost entirely on one precedent—*Pleasant Grove City* v. *Summum*, 555 U. S. 460—the Court holds that messages that private groups succeed in placing on Texas license plates are government messages.  The Court badly misunderstands *Summum*.

In *Summum*, a private group claimed the right to erect a large stone monument in a small city park.  *Id.*, at 464. The 2.5-acre park contained 15 permanent displays, 11 of which had been donated by private parties.  *Ibid.*  The central question concerned the nature of the municipal government's conduct when it accepted privately donated monuments for placement in its park:  Had the city created a forum for private speech, or had it accepted donated monuments that expressed a government message?  We held that the monuments represented government speech, and we identified several important factors that led to this conclusion.

First, governments have long used monuments as a means of expressing a government message.  As we put it, "[s]ince ancient times, kings, emperors, and other rulers have erected statues of themselves to remind their subjects of their authority and power."  *Id.*, at 470.  Here in

the United States, important public monuments like the Statue of Liberty, the Washington Monument, and the Lincoln Memorial, express principles that inspire and bind the Nation together. Thus, long experience has led the public to associate public monuments with government speech.

Second, there is no history of landowners allowing their property to be used by third parties as the site of large permanent monuments that do not express messages that the landowners wish to convey. See *id.*, at 471. While "[a] great many of the monuments that adorn the Nation's public parks were financed with private funds or donated by private parties," "cities and other jurisdictions take some care in accepting donated monuments" and select those that "conve[y] a government message." *Id.*, at 471–472. We were not presented in *Summum* with any examples of public parks that had been thrown open for private groups or individuals to put up whatever monuments they desired.

Third, spatial limitations played a prominent part in our analysis. See *id.*, at 478–479. "[P]ublic parks can accommodate only a limited number of permanent monuments," and consequently permanent monuments "monopolize the use of the land on which they stand and interfere permanently with other uses of public space." *Ibid.* Because only a limited number of monuments can be built in any given space, governments do not allow their parks to be cluttered with monuments that do not serve a government purpose, a point well understood by those who visit parks and view the monuments they contain.

These characteristics, which rendered public monuments government speech in *Summum*, are not present in Texas's specialty plate program.

### B

### 1

I begin with history. As we said in *Summum*, govern-ments have used monuments since time immemorial to express important government messages, and there is no history of governments giving equal space to those wishing to express dissenting views. In 1775, when a large gilded equestrian statue of King George III dominated Bowling Green, a small park in lower Manhattan,[3] the colonial governor surely would not have permitted the construction on that land of a monument to the fallen at Lexington and Concord. When the United States accepted the Third French Republic's gift of the Statue of Liberty in 1877, see *id.*, at 477, Congress, it seems safe to say, would not have welcomed a gift of a Statue of Authoritarianism if one had been offered by another country. Nor is it likely that the National Park Service today would be receptive if private groups, pointing to the Lincoln Memorial, the Martin Luther King, Jr., Memorial, and the Vietnam Veterans Memorial on the National Mall, sought permission to put up monuments to Jefferson Davis, Orval Faubus, or the North Vietnamese Army. Governments have always used public monuments to express a government message, and members of the public understand this.

The history of messages on license plates is quite differ-ent. After the beginning of motor vehicle registration in 1917, more than 70 years passed before the proliferation of specialty plates in Texas. It was not until the 1990's that motorists were allowed to choose from among 10 messages, such as "Read to Succeed" and "Keep Texas Beautiful." History at 101.

Up to this point, the words on the Texas plates can be considered government speech. The messages were created

―――――――――

[3] The Statue That Was Made Into Bullets, N. Y. Times Magazine, July 21, 1901, at p.6.

by the State, and they plausibly promoted state pro-grams.[4]  But when, at some point within the last 20 years or so, the State began to allow private entities to secure plates conveying their own messages, Texas crossed the line.

The contrast between the history of public monuments, which have been used to convey government messages for centuries, and the Texas license plate program could not be starker.

In an attempt to gather historical support for its posi-tion, the Court relies on plates with the mottos or symbols of other States.  As the Court notes, some of these were issued well before "The Lone Star State" made its debut in Texas in 1991.  *Id.*, at 82.  But this history is irrelevant for present purposes.  Like the 1991 Texas plate, these out-of-state plates were created by the States that issued them, and motorists generally had no choice but to accept them.  For example, the State of New Hampshire made it a crime to cover up the words "Live Free or Die" on its plates.  See *Wooley* v. *Maynard*, 430 U. S. 705 (1977).

The words and symbols on plates of this sort were and are government speech, but plates that are essentially commissioned by private entities (at a cost that exceeds $8,000) and that express a message chosen by those enti-ties are very different—and quite new.  Unlike in *Sum-mum*, history here does not suggest that the messages at issue are government speech.

2

The Texas specialty plate program also does not exhibit the "selective receptivity" present in *Summum*.  To the contrary, Texas's program is *not* selective by design.  The Board's chairman, who is charged with approving designs,

---

[4] This opinion does not address whether the unique combination of letters and/or numbers assigned to each vehicle, even when selected by the motorist, is private speech.

explained that the program's purpose is "to encourage private plates" in order to "generate additional revenue for the state." *Ibid.*, 58. And most of the time, the Board "base[s] [its] decisions on rules that primarily deal with reflectivity and readability." *Ibid*. A Department brochure explains: "Q. Who provides the plate design? A. You do, though your design is subject to reflectivity, legibility, and design standards." *Id.,* at 67.b.

Pressed to come up with any evidence that the State has exercised "selective receptivity," Texas (and the Court) rely primarily on sketchy information not contained in the record, specifically that the Board's predecessor (might have) rejected a "pro-life" plate and perhaps others on the ground that they contained messages that were offensive. See *ante*, at 11 (citing Reply Brief 10 and Tr. of Oral Arg. 49–51). But even if this happened, it shows only that the present case may not be the only one in which the State has exercised viewpoint discrimination.

Texas's only other (also extrarecord) evidence of selectivity concerns a proposed plate that was thought to create a threat to the fair enforcement of the State's motor vehicle laws. Reply Brief 9–10 (citing publicly available Transcript of Texas Department of Motor Vehicles Board Meeting, Aug. 9, 2012, p. 112, online at http:// www.txdmv.gov/reports-and-data/doc_download/450–2012– tran-aug9). This proposed plate was a Texas DPS Troopers Foundation (Troopers) plate, proposed in 2012. The Board considered that proposed plate at an August 2012 meeting, at which it approved six other plate designs without discussion, but it rejected the Troopers plate in a deadlocked vote due to apparent concern that the plate could give the impression that those displaying it would receive favored treatment from state troopers. *Id.*, at 109–112. The constitutionality of this Board action does not necessarily turn on whether approval of this plate would have made the message government speech. If, as I believe, the

Texas specialty plate program created a limited public forum, private speech may be excluded if it is inconsistent with the purpose of the forum. *Rosenberger,* 515 U. S., at 829.

Thus, even if Texas's extrarecord information is taken into account, the picture here is different from that in *Summum*. Texas does not take care to approve only those proposed plates that convey messages that the State supports. Instead, it proclaims that it is open to all private messages—except those, like the SCV plate, that would offend some who viewed them.

The Court believes that messages on privately created plates are government speech because motorists want a seal of state approval for their messages and therefore prefer plates over bumper stickers. *Ante*, at 10–11. This is dangerous reasoning. There is a big difference between government speech (that is, speech by the government in furtherance of its programs) and governmental blessing (or condemnation) of private speech. Many private speakers in a forum would welcome a sign of government approval. But in the realm of private speech, government regulation may not favor one viewpoint over another. *Rosenberger, supra*, at 828.

3

A final factor that was important in *Summum* was space. A park can accommodate only so many permanent monuments. Often large and made of stone, monuments can last for centuries and are difficult to move. License plates, on the other hand, are small, light, mobile, and designed to last for only a relatively brief time. The only absolute limit on the number of specialty plates that a State could issue is the number of registered vehicles. The variety of available plates is limitless, too. Today Texas offers more than 350 varieties. In 10 years, might it be 3,500?

In sum, the Texas specialty plate program has none of the factors that were critical in *Summum*, and the Texas program exhibits a very important characteristic that was missing in that case: Individuals who want to display a Texas specialty plate, instead of the standard plate, must pay an increased annual registration fee. See http://www.dmv.org/tx-texas/license-plates.php. How many groups or individuals would clamor to pay $8,000 (the cost of the deposit required to create a new plate) in order to broadcast the government's message as opposed to their own? And if Texas really wants to speak out in support of, say, Iowa State University (but not the University of Iowa) or "Young Lawyers" (but not old ones), why must it be paid to say things that it really wants to say? The fees Texas collects pay for much more than merely the administration of the program.

States have not adopted specialty license plate programs like Texas's because they are now bursting with things they want to say on their license plates. Those programs were adopted because they bring in money. Texas makes public the revenue totals generated by its specialty plate program, and it is apparent that the program brings in many millions of dollars every year. See http://www.txdmv.gov/reports-and-data/doc_download/5050–specialty-plates-revenue-fy-1994-2014.

Texas has space available on millions of little mobile billboards. And Texas, in effect, sells that space to those who wish to use it to express a personal message—provided only that the message does not express a viewpoint that the State finds unacceptable. That is not government speech; it is the regulation of private speech.

## III

What Texas has done by selling space on its license plates is to create what we have called a limited public forum. It has allowed state property (*i.e.,* motor vehicle

license plates) to be used by private speakers according to rules that the State prescribes. Cf. *Good News Club* v. *Milford Central School*, 533 U. S. 98, 106–107 (2001). Under the First Amendment, however, those rules cannot discriminate on the basis of viewpoint. See *Rosenberger*, 515 U. S., at 829 (quoting *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 806 (1985)). But that is exactly what Texas did here. The Board rejected Texas SCV's design, "specifically the confederate flag portion of the design, because public comments have shown that many members of the general public find the design offensive, and because such comments are reasonable." App. 64. These statements indisputably demonstrate that the Board denied Texas SCV's design because of its viewpoint.

The Confederate battle flag is a controversial symbol. To the Texas Sons of Confederate Veterans, it is said to evoke the memory of their ancestors and other soldiers who fought for the South in the Civil War. See *id.,* at 15–16. To others, it symbolizes slavery, segregation, and hatred. Whatever it means to motorists who display that symbol and to those who see it, the flag expresses a viewpoint. The Board rejected the plate design because it concluded that many Texans would find the flag symbol offensive. That was pure viewpoint discrimination.

If the Board's candid explanation of its reason for rejecting the SCV plate were not alone sufficient to establish this point, the Board's approval of the Buffalo Soldiers plate at the same meeting dispels any doubt. The proponents of both the SCV and Buffalo Soldiers plates saw them as honoring soldiers who served with bravery and honor in the past. To the opponents of both plates, the images on the plates evoked painful memories. The Board rejected one plate and approved the other.

Like these two plates, many other specialty plates have the potential to irritate and perhaps even infuriate those

who see them.   Texas allows a plate with the words
"Choose Life," but the State of New York rejected such a
plate because the message "'[is] so incredibly divisive,'"
and the Second Circuit recently sustained that decision.
*Children First Foundation, Inc.* v. *Fiala*, ___ F. 3d ___, ___,
2015 WL 2444501, \*18 (CA2, May 22, 2015).  Texas allows
a specialty plate honoring the Boy Scouts, but the group's
refusal to accept gay leaders angers some.  Virginia, an-
other State with a proliferation of specialty plates, issues
plates for controversial organizations like the National
Rifle Association, controversial commercial enterprises
(raising tobacco and mining coal), controversial sports (fox
hunting), and a professional sports team with a controver-
sial name (the Washington Redskins).  Allowing States to
reject specialty plates based on their potential to offend is
viewpoint discrimination.

The Board's decision cannot be saved by its suggestion
that the plate, if allowed, "could distract or disturb some
drivers to the point of being unreasonably dangerous."
App. 65.  This rationale cannot withstand strict scrutiny.
Other States allow specialty plates with the Confederate
Battle Flag,[5] and Texas has not pointed to evidence that
these plates have led to incidents of road rage or accidents.
Texas does not ban bumper stickers bearing the image of
the Confederate battle flag.  Nor does it ban any of the
many other bumper stickers that convey political messages
and other messages that are capable of exciting the ire
of those who loathe the ideas they express.  Cf. *Good News
Club*, *supra*, at 111–112.

\*    \*    \*

Messages that are proposed by private parties and
placed on Texas specialty plates are private speech, not

—————

[5] See   http://www.dmv.virginia.gov/vehicles/#splates/category.asp?
category=SCITTexas

government speech.  Texas cannot forbid private speech based on its viewpoint.  That is what it did here. Because the Court approves this violation of the First Amendment, I respectfully dissent.

APPENDIX

Sample Texas Specialty Plates

 

 

 

 

Appendix to opinion of ALITO, J.































Appendix to opinion of ALITO, J.
















22      WALKER *v.* TEXAS DIV., SONS OF
CONFEDERATE VETERANS, INC.

Appendix to opinion of ALITO, J.
















Appendix to opinion of ALITO, J.












All found at http://txdmv.gov/motorists/license-
plates/specialty-license-plates