# United States Court of Appeals
## For the First Circuit

No. 25-1356

STEPHEN SCAER; BETHANY R. SCAER,

Plaintiffs, Appellants,

v.

CITY OF NASHUA, NEW HAMPSHIRE,

Defendant, Appellee,

JAMES W. DONCHESS, Mayor, City of Nashua, New Hampshire;
JENNIFER L. DESHAIES, Risk Manager, City of Nashua, New
Hampshire,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Gelpí, Lynch, and Howard,
Circuit Judges.

Nathan J. Ristuccia, with whom Roy S. McCandless, Roy S.
McCandless, Esq., PLLC, Endel Kolde, and Institute for Free Speech
were on brief, for appellants.

Steven A. Bolton, with whom Jonathan A. Barnes, City of
Nashua, Office of Corporation Counsel, was on brief, for appellee.

December 22, 2025

LYNCH, Circuit Judge.  In this appeal by two Nashua, New Hampshire citizens from the denial of their motion for a preliminary injunction, the City of Nashua concedes that if the City's decision not to allow these two citizens' requests to fly flags on a "Citizen Flag Pole" on City Hall Plaza was not government speech, then the City has engaged in impermissible viewpoint discrimination under the First Amendment.  We hold that the district court erred in concluding that the City had engaged in government speech.  Under the test defining government speech outlined in Shurtleff v. City of Boston, 596 U.S. 243 (2022), Nashua during the time period at issue was not engaged in government speech as to the Citizen Flag Pole.  We also conclude, as appellants conceded at oral argument, that interim declaratory relief in appellants' favor suffices to remedy the violation.

## I.

## A.

For purposes of this appeal, the material facts are not in dispute.

The current Nashua City Hall was built in 1939.  On City Hall Plaza, the government property outside of City Hall that is open to the public, there are four flagpoles of varying heights. Until 2017, Nashua exercised exclusive control over the flags flown on the poles, choosing to display only government flags such as the American flag and the New Hampshire state flag.  The City

continues to exercise such control over three of the flagpoles. In 2017, after the election of Mayor James W. Donchess,[1] who has since been reelected to that position, Nashua created what it called the "Citizen Flag Pole" as to one of the poles.[2]

The City's website, under the headings "Citizen Flag Pole" and "Fly a Flag," provided a statement, which in total read:

> A pole in front of City Hall is reserved for the citizens of Nashua to fly a flag in support of their cultural heritage, observe an anniversary or honor a special accomplishment. Any group wishing to fly a flag must provide the flag.

The website provided no other written guidance describing the program and directed interested parties to contact Nashua's Risk Management Office for further information.

Private citizens and groups interested in flying a flag on the Citizen Flag Pole were required to submit to the City's Risk Manager a Special Events Application, which in turn required them to request specific dates to fly a flag and also to confirm that they would abide by local ordinances and agree to indemnify the City for any damages caused by their flag raising event. The record does not reflect any substantive review by the Risk Manager

---

[1] Donchess previously served two terms as Nashua's mayor from 1984 to 1991. As the City has acknowledged, "[t]he Mayor's office has always been in control of the policies concerning the flag[s]."

[2] Nashua did not use the name "Citizen Flag Pole" in the 2022 Flag Policy we describe later but recognizes that City officials continued to use the name, and the record reflects that members of the public did so as well. We use that descriptive term here.

but describes her role as ensuring that no two groups reserved the Citizen Flag Pole for the same period.

If the City did not own a proposed flag, applicants supplied their own flags, which remained their property while displayed on the Citizen Flag Pole. Applicants usually raised the flags themselves, using a tool borrowed from the City. Ordinarily, Nashua allowed approved flags to fly for approximately one week, after which time applicants were expected to retrieve their flags. Roughly ten flags were flown on the Citizen Flag Pole each year.[3] Many of the flag raisings were accompanied by a short, privately organized ceremony on City Hall Plaza, sometimes attended by local elected officials but often without any City representatives present. Applicants who planned a ceremony were required to provide additional details in their Special Events Application about the expected attendance and any anticipated sidewalk obstruction.

Appellants Stephen and Bethany Scaer have resided in Nashua for three decades. Beginning in 2017, Bethany submitted

___

[3] Groups of private citizens regularly flew flags on the Citizen Flag Pole to commemorate Pride Month, Indian Independence Day, Brazilian Independence Day, Greek Independence Day, International Francophonie Day (celebrating the French language and Francophone culture), and the anniversary of the founding of Nashua's Lions Club. Other flags flown once or on occasion included the Kurdistan flag, the Christian flag, the Lutheran flag, the Porcupine flag (described later), and flags supporting National Recovery Month and organ donation awareness.

and received approval for several applications to use the Citizen Flag Pole, including for flying the Luther Rose flag in honor of the 500th anniversary of the Protestant Reformation, the Lutheran flag, and a flag commemorating the ratification of the Nineteenth Amendment. For each approved request, Bethany supplied and raised the flag herself and organized a small flag raising ceremony not attended by any City officials.

Nashua initially approved Bethany's application to fly a "Save Women's Sports" flag, which the Scaers raised on October 10, 2020. The Scaers explain that the flag expresses their belief "that women have inalienable rights based on their biological sex that governments have a duty to protect and that allowing biological males to compete against women in sports denies women their rights and the equality due them under both the U.S. Constitution and Title IX."[4] One day after the flag's raising, and after the City received complaints that the flag was transphobic, Nashua reversed its approval, revoked permission, and

_____

[4] In July 2024, following public and legislative debate over transgender students' participation in athletics, New Hampshire enacted House Bill 1205, which requires participants on interscholastic sports teams to have the same biological sex at birth. See N.H. Rev. Stat. Ann. § 193:41. In September 2024, a federal district court preliminarily enjoined enforcement of HB 1205 as applied to two transgender students, finding that they were likely to succeed on their Equal Protection and Title IX claims. See Tirrell v. Edelblut, 748 F. Supp. 3d 19, 41, 47 (D.N.H. 2024). The litigation has not quelled public debate about transgender athletic participation in New Hampshire schools.

removed the flag from the Citizen Flag Pole.  Bethany appealed the decision to Mayor Donchess, who denied the appeal.  He explained in a public statement on October 14, 2020, that Bethany's flag "contain[ed] a discriminatory message toward the transgender community" and that "Nashua is a welcoming community, in which we embrace all people and the contributions of all are celebrated and valued."  Nashua's Corporation Counsel sent a letter to Bethany's attorney on November 11, 2020, stating that the Save Women's Sports flag "was outside of the parameters established for use of the citizen flag pole" and that use of that pole was "government speech."

Nashua's records reveal that from the Citizen Flag Pole program's launch in 2017 through 2020, the City did not reject a single request to fly a flag.  That changed in 2020 when the City revoked permission for Bethany's Save Women's Sports flag and soon afterward denied an application to fly the "Porcupine" flag associated with the Free State Project and the Libertarian Party.

In May 2022, the Supreme Court decided Shurtleff, holding that Boston's refusal to allow a private group to raise a religious flag on a flagpole outside City Hall violated the First Amendment's Free Speech Clause.  See 596 U.S. at 248.  Nine days later, saying it was responding to Shurtleff, Nashua adopted and posted to its website a written policy governing the use of what had previously been referred to as the Citizen Flag Pole and

- 7 -

stating the City's position that use of that pole constituted government speech.  The 2022 policy, which was signed by the Mayor and the Risk Manager on behalf of the City and captioned "Flag Pole Policy," provided in its entirety:

> A flag pole in front of City Hall may be provided for use by persons to fly a flag in support of cultural heritage, observe an anniversary, honor a special accomplishment, or support a worthy cause.  Any group wishing to fly a flag must provide the flag.  This potential use of a City flag pole is not intended to serve as a forum for free expression by the public.  Any message sought to be permitted will be allowed only if it is in harmony with [C]ity policies and messages that the [C]ity wishes to express and endorse.  This policy recognizes that a flag flown in front of City Hall will be deemed by many as City support for the sentiment thereby expressed, [C]ity administration reserves the right to deny permission or remove any flag it considers contrary to the City's best interest.[5]

Around the same time, Nashua also revised its "Special Events Procedures" on its website to include a section entitled "Request for Use of the City Flag Pole."  That section required applicants to submit a photograph of their proposed flag and an explanation of the message intended to be conveyed.  It did not provide details about which flags were permissible or impermissible.  It noted that requests would be evaluated by the Risk Manager in accordance with the new policy.  While the 2022 policy did not use the name Citizen Flag Pole, it did not disclaim use of that name, and both citizens and City officials have continued to use that name.

---

[5] The 2022 policy included the contact information for the City's Risk Management office to use "[f]or more information."

- 8 -

Since implementing the 2022 policy, Nashua has denied several of the Scaers' applications and others' applications to use the Citizen Flag Pole. In May 2022, Bethany applied to fly the Save Women's Sports flag in honor of the fiftieth anniversary of Title IX. In February 2024, Stephen applied to fly the "Detransitioner Awareness" flag and to host a small flag raising ceremony.[6] And in May 2024, Bethany applied to fly the "Pine Tree" flag to commemorate the anniversary of the Battle of Bunker Hill. That Pine Tree flag was also used during the January 6, 2021, attack on the U.S. Capitol. Nashua denied each request on the ground that the proposed message was not "in harmony with [C]ity policies" or one "that the [C]ity wishe[d] to express and endorse," and on administrative appeal the Mayor upheld each denial. For the same stated reason, Nashua also denied requests by other applicants to fly the "Pro-Life" flag and the Palestinian flag.

**B.**

On September 6, 2024, the Scaers brought suit against the City, its Mayor, and its Risk Manager[7] under 42 U.S.C. § 1983.

---

[6] The Detransitioner Awareness flag depicts a blue-green lizard against a black background with the words "De-Trans Awareness" along the bottom. According to Stephen, the lizard was chosen for its ability to survive the loss of certain body parts and grow them back. He says the flag is meant to raise awareness about gender transitioners and the difficulties they face.

[7] Mayor Donchess and Risk Manager Jennifer L. Deshaies, who likewise held her position during all times relevant to this litigation, were dismissed as parties to the appeal.

The complaint alleged that Nashua's 2022 policy violated the First and Fourteenth Amendments, both on its face and as applied to the Scaers' flag flying applications. That same day, the Scaers filed a motion for preliminary injunction, seeking to enjoin Nashua from denying flag applications based on the viewpoint being expressed and preventing such flags from being flown on the Citizen Flag Pole.

On October 7, 2024, three days before Nashua filed its opposition to that motion, the City adopted a new policy governing the flagpoles outside City Hall, signed only by Mayor Donchess and captioned "City Hall Flagpole Policy." The policy states in full:

> The flagpoles on city hall grounds shall henceforth be exclusively controlled by [C]ity government. The [C]ity shall determine what flags will be flown and during what time periods and does not seek input from other sources. The flagpoles are not public fora open to others for expression but are solely for [C]ity government to convey messages it chooses. All previous policies related to flagpoles on city hall grounds are hereby repealed.

The City argued to the district court that this change in policy rendered the proposed injunctive relief moot. The Scaers disagreed.

After briefing and a hearing, a magistrate judge recommended denying the motion for a preliminary injunction. The magistrate judge rejected the City's mootness argument, saying it was not "absolutely clear" Nashua would not revert to its 2022 policy or implement a similar policy at some point in the future.

On the merits, the magistrate judge found that the Scaers' challenge was unlikely to succeed, reasoning that the flag flying program under the 2022 policy was government speech. The district court, in a short order, approved the report and recommendation, noted that it agreed with the magistrate judge's government speech determination, and denied the motion for a preliminary injunction.

The Scaers timely appealed from the district court's order. Nashua has conceded that the case is not moot, and both sides agree the dispositive question is whether Nashua's flag flying program was government speech.[8] If the program was not government speech, Nashua concedes that it has engaged in impermissible viewpoint discrimination under the First Amendment.

## C.

We review the denial of a preliminary injunction for abuse of discretion. See Ashcroft v. Am. C.L. Union, 542 U.S. 656, 664 (2004). We review legal conclusions de novo. See Dart Cherokee Basin Operating Co., LLC v. Owens, 574 U.S. 81, 91 (2014).

The key question before us is whether Nashua's Citizen Flag Pole program constituted government speech. If it did not, and instead operated effectively as a forum for private speech, Nashua violated the First Amendment in picking and choosing among

---

[8] The Scaers' challenge goes only to the denial of their requests to fly flags on the Citizen Flag Pole. Demonstrations, rallies, or other expressive activity on City Hall Plaza present different First Amendment questions and are not before us.

viewpoints. "When the government encourages diverse expression . . . the First Amendment prevents it from discriminating against speakers based on their viewpoint." Shurtleff, 596 U.S. at 247. "But when the government speaks for itself, the First Amendment does not demand airtime for all views." Id. at 247-48. To function, "the government must be able to 'promote a program' or 'espouse a policy.'" Id. at 248 (quoting Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 208 (2015)).

As Shurtleff acknowledges, "[t]he line between a forum for private expression and the government's own speech is important, but not always clear." Id. That line "can blur when, as here, a government invites the people to participate in a program." Id. at 252. The Supreme Court has cautioned that the government speech doctrine is "susceptible to dangerous misuse" and that it risks permitting government to "silence or muffle the expression of disfavored viewpoints" by "pass[ing] off" "private speech" "as government speech." Matal v. Tam, 582 U.S. 218, 235 (2017). Accordingly, courts "must exercise great caution before extending [the Supreme Court's] government-speech precedents." Id.

Shurtleff directs courts to ask whether the "government-public engagement transmit[s] the government's own message" or instead "create[s] a forum for the expression of private speakers' views." 596 U.S. at 252. This is "a holistic inquiry designed to

- 12 -

determine whether the government intends to speak for itself or to regulate private expression." Id. This inquiry "is not mechanical" but "driven by a case's context." Id. It looks to "several types of evidence," including "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." Id.

Shurtleff's first prong emphasizes the importance of looking to the history of flag flying at the seat of government to prevent cities from misusing the government speech label as a means of engaging in impermissible viewpoint discrimination. See id. at 253-55. As the Court stated, "the content of a flag, [and] its presence and position have long conveyed important messages about government." Id. at 254. Until 2017, the historic use of the flagpoles in front of City Hall was to display only government flags, and three of the four poles have continued to do so.[9] The decision to use one pole as the Citizen Flag Pole, for flags chosen and supplied by private parties, is a relatively recent departure

_____

[9] The record does not establish when the flagpoles were installed. It is undisputed, however, that before 2017 the City used the poles to display only government flags, and neither side suggests that the poles are of recent origin. It is reasonable to assume that the flagpoles outside City Hall were not newly installed by 2017 and further that Nashua's pre-2017 practice of flying only government flags was longstanding relative to the recently created and short-lived Citizen Flag Pole program.

- 13 -

from prior policy and is confined to the period beginning in 2017 under Mayor Donchess's administration. Nashua's attempt to characterize viewpoint-based decisions as to which flags are approved to fly on the Citizen Flag Pole within this short-lived program as government speech is unpersuasive. That history "is only our starting point"; "we must examine the details of this flag-flying program." Id. at 255.

Shurtleff's second prong, set against the background of Pleasant Grove City v. Summum, 555 U.S. 460 (2009); Walker v. Texas Division, Sons of Confederate Veterans, Inc., 576 U.S. 200 (2015); and Matal v. Tam, 582 U.S. 218, 235 (2017), considers "whether the public would tend to view the speech at issue as the [City] government's." Shurtleff, 596 U.S. at 255. This is a closer point but ultimately tends to support the Scaers. Several themes support our conclusion. We start with the fact that, from 2017 onward, both the public and City officials commonly used the name "Citizen Flag Pole," not the "Nashua government flagpole." The City has never disavowed that name, and it was a name used to distinguish that particular flagpole from the remaining three flagpoles, which displayed only government flags. So "even if the public would ordinarily associate a flag's message with" Nashua, "that is not necessarily true for the flags [on the flagpole] at issue here." Id. Next is the fact that the private citizens whose flags were

flown usually had a ceremony without any Nashua officials present when the private flags were first raised.  As Shurtleff noted:

> [A] pedestrian glimpsing a flag other than [a government flag on the pole at issue] might simply look down onto the plaza, see a group of private citizens conducting a ceremony without the [C]ity's presence, and associate the new flag with them, not [the City].

Id. at 255.  These private citizens' flags were flown for the duration requested by the citizen, often for a week.[10]

It is hard to see why the public would view flags on the Citizen Flag Pole as "government speech" when, for example, the government first approves the flying of a flag and later rescinds approval and removes the flag, not as a result of any change in government policy, but in response to criticism received from other members of the public; this sequence resembles a classic heckler's veto.  Cf. United States v. Trump, 88 F.4th 990, 1015 (D.C. Cir. 2023) (The heckler's veto doctrine "prohibits restraining speech on the grounds that it 'might offend a hostile mob' hearing the message or because its audience might express 'hostility to' the message." (emphasis omitted) (first quoting Forsyth County v.

---

[10] As reflected in the record before the Supreme Court, when the flag flying request at issue in Shurtleff was made, Boston allowed private flags to fly on a City Hall flagpole "for any length of time" -- usually "for a few days," but sometimes longer "depending on the schedule," including the length of time requested by the applicant.  Boston later adopted a policy providing that private flags would "normally only be flown 24 hours or less," but the City retained discretion to approve longer displays.  The Court did not treat the duration of a private flag's display as dispositive one way or the other.

Nationalist Movement, 505 U.S. 123, 134-35 (1992); and then quoting Cox v. Louisiana, 379 U.S. 536, 561 (1965))).

We also note that the City regularly permitted a rotating array of private flags, which conveyed different and sometimes dissonant messages. This evidences that the flag flying program was not primarily a vehicle for government expression. As the Court observed in Tam, if those various and dissimilar messages were government speech, then the citizens of Nashua could easily wonder whether Nashua was messaging "incoherently," and indeed what message the City "ha[d] in mind."[11] 582 U.S. at 236.

Under the third prong of Shurtleff, we "look at the extent to which [the City] actively controlled these flag raisings and shaped the messages the flags sent." 596 U.S. at 256. It is the City's "control over the flags' content and meaning that here is key; that type of control would indicate that [it was the City that] meant to convey the flags' messages." Id. Under the program started in 2017, Nashua exercised very little control over the Citizen Flag Pole. From 2017 to 2020, the City did not reject a single application; all proposed flags were permitted to be flown, often without any City involvement beyond scheduling. Indeed, the

_____

[11] For example, it is far from clear what message Nashua intended to convey when in 2024 it rejected the Detransitioner Awareness flag at the same time that the New Hampshire legislature was considering as a statewide matter legislation regulating athletic competitions in which transgender students played in public school sporting events.

- 16 -

City did not even assume the risk of the flag raisings, requiring indemnification from the citizen applicant, and there is no indication it ever did not require citizen indemnification. Nashua changed its practice in 2020, when it rejected an application to fly the Porcupine flag -- which it had previously permitted to be flown on multiple occasions -- and revoked permission for Bethany's Save Women's Sports flag. The City concedes that its pre-2022 policy treated the Citizen Flag Pole as a forum for private speech. Nashua did not deny another request until after it adopted the 2022 policy, after which the City rejected five applications based on the content of the messages the flags conveyed, saying these messages were not "in harmony with city policies" or ones "that the [C]ity wishe[d] to express and endorse." At no time did Nashua design or take ownership of those flags flown on the Citizen Flag Pole. Indeed, the 2024 policy in saying the flagpoles "shall henceforth be exclusively controlled by [C]ity government" is an admission that they had not before then been under exclusive government control (emphasis added).

Comparing the extent of Nashua's control over the flags flown on this pole with the degree of government involvement in the Supreme Court's most relevant precedents supports our conclusion. In Summum, 555 U.S. 460, the Court emphasized that the city "always selected which monuments it would place in its park (whether or not the government funded those monuments), and

- 17 -

it typically took ownership over them." Shurtleff, 596 U.S. at 257 (citing Summum, 555 U.S. at 472-73). Nashua also never exercised the types and degree of control present in Walker, 576 U.S. 200, where "a state board 'maintain[ed] direct control' over license plate designs by 'actively' reviewing every proposal and rejecting at least a dozen." Shurtleff, 596 U.S. at 257 (alteration in original) (quoting Walker, 576 U.S. at 213). Nor is the nature and degree of government control on these facts at all comparable to the town website and its hyperlink to a state-sponsored event website that we found to be government speech in Sutliffe v. Epping School District, 584 F.3d 314, 334-35 (1st Cir. 2009).

Nashua's lack of engagement in crafting the content or manner of expression on the Citizen Flag Pole under the 2022 policy supports our view that Nashua was doing no more than simply approving that private speech with which it agreed, despite operating the flagpole as what we conclude was a forum for such private speech. As the Supreme Court has cautioned, "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval" without more significant government involvement, the "government could silence or muffle the expression of disfavored viewpoints." Matal, 582 U.S. at 235.

In a final effort to save its case, Nashua incorrectly argues that its 2022 policy survives because it was sufficiently

like the City of San José, California's policy on which Shurtleff commented favorably.  See Shurtleff, 596 U.S. at 257-58.  San José's detailed three-page policy stated that the City's "flagpoles are not intended to serve as a forum for free expression by the public" and then listed approved flags that may be displayed "as an expression of the City's official sentiments."  Id.  Those approved flags were limited to federal, state, and city flags, and to a narrow set of ceremonial flags.  See City of San José, Cal., Council Policy No. 2-1, Exhibition of Federal, State, and City Flags from City Buildings - All Occasions (rev. Oct. 17, 2006) ("San José Policy") at 1, 3, https://perma.cc/JEJ5-ULDN.[12]  In addition, the approved ceremonial flags could only be displayed subject to two more restrictions, namely, only in connection with official City actions or events and only at the direction or

---

[12] San José's flag flying policy approved the display of the United States flag, the California state flag, the San José City flag, and a New City Hall flag.  See San José Policy at 1.  For those government flags, the policy created rules specifying locations, order of precedence, hours of display, illumination, and the days on which flags would be flown, including specified state and federal holidays and other designated occasions.  See id. at 1-2.  The policy also approved the display of the following ceremonial flags: flags of governments recognized by the United States; flags of San José's official Sister Cities in conjunction with related events; flags flown in conjunction with official actions, ceremonial items, or proclamations of the City Council; and, at the City Manager's discretion, flags of professional sports teams in commemoration of significant achievements involving the City.  See id. at 3.  The policy separately addressed "street flags," defined as "flags flown on a guy wire over a city street," which were permitted only in the downtown area, only on Veterans Day and Memorial Day, and only with City Council approval.  Id.

request of designated City officials.  See id. at 3.  San José did not invite or accept proposals from private parties, did not allow private parties to supply, raise, or fly flags on city-owned poles, and did not permit privately organized flag raising ceremonies. Nashua's 2022 policy is nothing like San José's policy.  Nashua continued to reserve a pole for private parties to fly a flag in support of their own causes, accepted unsolicited applications from private parties, permitted the private parties to pick the dates on which the flags were flown and to supply and retain ownership of the flags, and allowed private parties to arrange ceremonies.  Nashua's mere copying of San José's disclaimer that its flagpoles are "not intended to serve as a forum for free expression by the public," without also adopting San José's tightly controlled, closed-list system of flag selection, is insufficient to convert the Citizen Flag Pole program into government speech.

Even under the test preferred by the concurring opinion of three Justices in Shurtleff, Nashua's policy is clearly not government speech.  See id. at 261-62 (Alito, J., concurring). That test asks "whether the government is actually expressing its own views or the real speaker is a private party and the government is surreptitiously engaged in the 'regulation of private speech.'" Id. at 263 (quoting Summum, 555 U.S. at 467).  As the concurrence explains, "government speech occurs if -- but only if -- a government purposefully expresses a message of its own through

- 20 -

persons authorized to speak on its behalf, and in doing so, does not rely on a means that abridges private speech." Id. at 267. The concurrence further explains that "a government can speak using private assistance" in only two ways: by deputizing private persons as its agents to convey a government message, or by adopting a privately created medium of expression over which the private party has alienated control to the government and then using that medium to intentionally express a government message. See id. at 270.

Nashua's policy and practice neither deputized private persons as its agents nor adopted a privately created medium that had been alienated to it for expressing a government message. See id.; see also id. at 272 (stating that the mere "creation of a space for private discourse does not involve expressing a governmental message, deputizing private parties to express it, or adopting a private party's contribution as a vehicle of government speech"). On these facts, "the only viable inference is that the City had no policy restricting access to the [flagpole] forum apart from the modest access conditions articulated in the application materials." Id. at 276. Where "the government is simply providing a forum for private parties to submit their own productions . . . usual First Amendment principles apply." Id. at 270-71.

Nashua has conceded that if this court determines, as we do, that its flag flying policy and practices are not government

speech, it has engaged in impermissible viewpoint discrimination under the First Amendment.

**D.**

Although the Scaers initially sought a preliminary injunction enjoining Nashua from administering the Citizen Flag Pole program in a viewpoint-discriminatory manner, their counsel acknowledged at oral argument before this court that interim declaratory relief would be a sufficient remedy.[13] That was a wise concession. A declaratory judgment may "have much the same practical effect as [an injunction]" but is a "milder remedy" that "does not, in itself, coerce any party or enjoin any future action." Brito v. Garland, 22 F.4th 240, 251 (1st Cir. 2021) (second and third quoting Ulstein Mar., Ltd. v. United States, 833 F.2d 1052, 1055 (1st Cir. 1987)). For example, a declaratory judgment does not "set the stage for a finding of contempt -- a distinction of special note in cases in which the government is a party." Id. "We have recognized that because '[i]njunctions and declaratory judgments are different remedies,' the latter may be 'available in situations where an injunction is unavailable or inappropriate.'" Id. (alteration in original) (quoting Ulstein Mar., 833 F.2d at 1055); see also La Liga de Ciudades de P.R. v.

---

[13] While the parties have briefed the case as though the issue of permanent injunctive relief merged with the issue of preliminary injunctive relief, there was no such agreement in the district court.

Fin. Oversight & Mgmt. Bd. for P.R. (In re. Fin. Oversight & Mgmt. Bd. for P.R., 110 F.4th 295, 327 (1st Cir. 2024) ("'[D]eclaratory relief is alternative or cumulative' to interim relief." (quoting Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Loc. No. 2322, 651 F.3d 176, 189 (1st Cir. 2011))).

The Scaers have also represented to us that they do not seek to prevent Nashua from closing the Citizen Flag Pole to all private expression or to return to the pre-2017 historic use of its flagpoles.

**II.**

We **reverse and remand** with instructions that the district court enter an interim declaratory judgment consistent with this opinion.

So ordered.